# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Justin Kasey Weikle,**
**Petitioner Below, Petitioner**

**FILED**

February 9, 2015

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 13-1278** (Mercer County 12-C-223)

**William J. Vest, Warden,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Justin Weikle, by counsel Natalie N. Hager, appeals the Circuit Court of Mercer County's November 18, 2013, order denying his petition for writ of habeas corpus. Respondent William J. Vest, Warden,[1] by counsel Laura Young, filed a response. On appeal, petitioner alleges that the circuit court erred in denying habeas relief on the following grounds: disproportionate sentence, involuntary guilty plea, ineffective assistance of counsel, incompetence at the time of the crimes, and excessive bail.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was arraigned in a Mercer County Magistrate Court in August of 2009 on five counts of forgery, four counts of uttering, and one count of attempted uttering. Records indicate that petitioner faced additional charges in Monroe and Greenbrier Counties, as well as in the State of Virginia. The Mercer County matter was then bound over to a grand jury. In February of 2010, petitioner and counsel appeared in circuit court and consented, by oral and written waiver, to the filing of an information charging him with one count of fraudulent schemes, two counts of forgery, and two counts of uttering.[2] On the same date, the circuit court held a plea hearing during which petitioner pled guilty to all five counts from the information. In return, the State agreed not to pursue additional charges in Mercer County arising out of the theft and use of checkbooks or credit cards belonging to several individuals and a lumber company. The State also agreed to recommend that any sentences run concurrent with any sentence arising from the

---

[1]Pursuant to Rule 41(c) of the Rules of Appellate Procedure, we have substituted the respondent party's name with Warden William J. Vest because petitioner is currently incarcerated at Beckley Correctional Center.

[2]The State filed the information that same month.

1

Monroe County charges and not to prosecute petitioner as a habitual offender.

In March of 2010, the circuit court sentenced petitioner to consecutive terms of incarceration of one to ten years for each of the five counts to which he pled, resulting in an effective sentence of five to fifty years. Thereafter, petitioner filed one motion for reconsideration of his sentence by counsel, and three additional pro se motions for reconsideration, all of which were denied. In April of 2012, petitioner filed a *pro se* petition for writ of habeas corpus. After the circuit court appointed counsel, petitioner's attorney filed an amended petition for writ of habeas corpus later that year. The circuit court held an omnibus evidentiary hearing in October of 2012, after which it denied the amended petition for writ of habeas corpus. This appeal followed.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal, petitioner re-asserts the same claims that were rejected by the circuit court. First, petitioner re-asserts that his sentence was excessive and disproportionate to the character and degree of his offenses. He further re-asserts that his guilty plea was involuntary because he was not educated about the nature and consequences of his plea. Petitioner re-asserts that his trial counsel was ineffective because (1) she failed to request that the circuit court hold the motion for reconsideration in abeyance until all pending criminal charges against petitioner in other jurisdictions were resolved, (2) she told him some of his sentences would be ordered to run concurrently, (3) she failed to file a motion to reduce bond, and (4) she allowed another attorney, David Smith, to represent petitioner at sentencing without requiring Mr. Smith to confer with petitioner prior to sentencing. Finally, petitioner re-asserts that he was incompetent at the time the offenses were committed and, therefore, lacked criminal intent, and that his bail was excessive.

Upon our review and consideration of the circuit court's order, the parties' arguments, and record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on the errors he assigns on appeal, which were also argued below. Indeed, the circuit court's order includes well-reasoned findings and conclusions as to all of the assignments of error raised herein. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions and direct the Clerk to attach a copy of the circuit court's November 18, 2013, "Order Denying Petitioner's Petition for a Writ of Habeas Corpus Ad

Subjiciendum And Removing It From The Court's Active Docket" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 9, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

NOTED CIVIL DOCKET

NOV 18 2013

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA.

STATE OF WEST VIRGINIA, *ex rel,*
JUSTIN KASEY WEIKLE,                                        PETITIONER,

v.                          Civil Action No. 12-C-223-DS

DEBRA D. MINNIX, Warden
PRUNTYTOWN CORRECTIONAL CENTER,                 RESPONDENT.

## ORDER DENYING THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM AND REMOVING IT FROM THE COURT'S ACTIVE DOCKET

On October 15, 2012, this matter came before the Court, the Honorable Derek C. Swope presiding, for a hearing on the Petitioner's Petitions for Post-Conviction Habeas Corpus Relief, brought pursuant to the provisions of Chapter 53, Article 4A of the West Virginia Code, as amended, which were filed by the Petitioner *pro se* and also by and through his court-appointed counsel, Natalie Hager, Esq. The Petitioner filed an amended Petition for Writ of Habeas Corpus on July 31, 2012. The Petitioner and his counsel appeared at the omnibus hearing. Janet Williamson, Esq., Assistant Prosecuting Attorney, appeared on behalf of the State of West Virginia.

The Petitioner is seeking post-conviction habeas corpus relief from his indeterminate sentences of one (1) to ten (10) years on one count of Fraudulent Scheme, two counts of Uttering, and two counts of Forgery. These sentences were ordered to run consecutively. At the time of his sentencing, he had a detainer pending in Giles County, Virginia, and also had charges pending in Monroe and Greenbrier Counties, West Virginia.

1

Whereupon, the Court having retired and considered the Petitions, the State's response, the court files, the transcripts, the arguments of counsel, and the pertinent legal authorities, does hereby deny the Petitioner's Petitions for Habeas Corpus relief.

In support of the aforementioned denial, the Court makes the following General Findings of Fact and Conclusions of Law:

## I. FACTUAL/PROCEDURAL HISTORY

### Case No. 10-F-7;The Information/Counts Specific to Each Offense

#### A. The Information

By an Information filed with the consent of the Petitioner on February 8, 2010, the State of West Virginia charged the Petitioner with one (1) count of Fraudulent Scheme, two (2) counts of Forgery, and two (2) counts of Uttering.

#### B. Counts Specific to Each Offense

Count One of the Information was filed by the State to cover between twenty-six (26) to thirty-two (32) separate misdemeanor offenses filed in Magistrate Court for various checks in small amounts passed within less than two weeks as part of an alleged common scheme, design or plan.

Counts Two and Three involved the Forgery and Uttering of the check of Richard Weikle and Linda L. Weikle drawn on the Bank of Monroe County and presented at Walmart on August 5, 2009.

Counts Four and Five involved the Forgery and Uttering of the check of Weikle Brothers Lumber Company drawn on the Bank of Monroe County and presented at Allen's Supermarket on August 15, 2009.

2

## C. Pre-Trial Proceedings

On August 17, 2009, the Petitioner was arraigned by Mercer County Magistrate James Dent on five (5) counts of Forgery, four (4) counts of Uttering, and one (1) count of Attempted Uttering charged in Mercer County, West Virginia. Court records indicate that there were also two (2) charges in Monroe County, West Virginia, specifically 09-M-314 and 09-M-315. The Mercer County matters were bound over to the Grand Jury by Magistrate Mike Flanigan on October 29, 2009. The Petitioner was represented by Sarah Harmon, Esq. of the Mercer County Public Defender's Office.

## D. Plea Agreement

On February 3, 2010, the Petitioner, represented by Ms. Harmon, appeared in the Circuit Court of Mercer County, West Virginia, before the undersigned Judge, and consented to the filing of the above Information by oral and written waiver. On the same date, a plea hearing was held at which the Petitioner pled guilty to all five (5) counts of the Information. The Petitioner acknowledged that he could receive five one (1) to ten (10) indeterminate sentences. Among other terms, the State agreed not to pursue further charges against the Petitioner in Mercer County, West Virginia, arising out of the theft and use of checkbooks or credit cards belonging to Richard Weikle, Linda Weikle, Keith Weikle, or Weikle Brothers Lumber Company. The State also agreed to recommend that the Petitioner's sentence run concurrently with any sentence received in Monroe County, West Virginia, pursuant to similar charges which were pending there. The State also agreed not to prosecute the Petitioner as a

3

Habitual Offender. The Court accepted the plea and ordered a pre-sentence investigation. Sentencing was set on March 15, 2010.

### E. Sentencing

On March 15, 2010, the Court sentenced the Petitioner as follows:

[t]hat he be taken from the bar of this Court to the Southern Regional Jail and therein confined until such time as the warden of the penitentiary can conveniently send a guard for him and that he be taken from the Southern Regional Jail to the penitentiary of this State and therein confined for the indeterminate term of not less than one (1) nor more than ten (10) years each as provided by law for the offense of "Fraudulent Scheme" as the State in Count 1 of its Information herein hath alleged, "Forgery" as the State in Counts 2 and 4 of its Information herein hath alleged and "Uttering" as the State in Count 3 and 5 of its Information herein hath alleged; that these sentences run consecutively with one another; that the defendant be given credit for 211 days on his sentence, this being the time he has served in jail; that he be dealt with in accordance with the rules and regulations of that institution and the laws of the State of West Virginia; that he pay all court costs within one (1) following his release from incarceration or be subject to having his driver's license suspended.

4

It is the further **ORDER** and **DECREE** of this Court that this sentence run concurrently with any sentence imposed by the State of Virginia and that the defendant be placed upon the West Virginia Division of Corrections' intake list and given normal priority for placement into a state correctional facility and that he not be kept in the regional jail merely on account of his sentence running concurrently with any sentence imposed by the State of Virginia.

## F. Post Plea Matters

On July 15, 2010, the Petitioner filed a *pro se* Motion for Reconsideration, stating that "I'm fully aware that I must take responsibility for my actions, I just hope to have the chance to make amends for those actions in a less substantial time period." He further stated, "I have a hard time believing the choices I willingly made that got me here, but I made them and understand the ramifications." He cited his previous successful completion of "18 months of parole with no violations."

On the same date, counsel filed a Motion to Reconsider sentence on behalf of the Petitioner. This motion recited his theft of checks in Monroe County, West Virginia, and forging/uttering them in Mercer and Greenbrier Counties and in Virginia. He was also going to be charged with twenty-six (26) misdemeanor counts of fraudulent use of a credit card, which were consolidated into the one (1) of felony Fraudulent Scheme. After the Petitioner was sentenced in Mercer County, he was sentenced to two (2) to twenty (20) years in Monroe County, West Virginia. At the time of this

5

motion charges were still pending against him in Greenbrier County. These motions were denied on October 1, 2010.

On June 10, 2011, the Petitioner filed a *pro se* Motion for Reconsideration, advising the Court that he had just returned from Virginia, where he was sentenced to ten (10) years, with nine (9) years and five (5) months sentence, requiring him to serve seven (7) months in Virginia, with three (3) years of probation upon release. He also stated that 'What I did was very wrong, and I deserve to be punished..." He also stated that "I relapsed after three (3) months of parole and it hit hard."

The Petitioner filed another Motion for Reconsideration in January, 2012. He stated that Monroe County had ordered his sentence to run concurrently with his Mercer County sentence. Greenbrier County dismissed its charges against him, and Virginia sentenced him as stated in his previous motion. He was then at the Department of Corrections' seven (7) month resident substance abuse treatment (RSAT) program. He was also taking college classes

The Petitioner was assigned to the Beckley Correctional Center on September 13, 2012.

II. **THE PETITIONER'S *PRO SE* PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM UNDER W. VA. CODE §53-4A-1/THE AMENDED PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM/ THE *LOSH* CHECKLIST; THE STATE'S ANSWER TO THE PETITION FOR WRIT OF HABEAS CORPUS; THE OMNIBUS HABEAS CORPUS HEARING**

A. **The Petitioner's *Pro Se* Petition for Writ of Habeas Corpus under W. Va. Code §53-4A-1**

The Petitioner filed his *pro se* Writ of Habeas Corpus on April 30, 2012. The Petitioner claimed that he received an excessive and severer sentence than expected, that

6

his trial counsel was ineffective, and that he received mistaken advice from counsel concerning his parole date. He also claimed that the plea bargain was unfulfilled. The Court appointed Natalie Hager, Esq., to represent the Petition in this proceeding.

**B. The Amended Petition for Writ of Habeas Corpus and Memorandum in Support of Amended Petition for Writ of Habeas Corpus**

On July 31, 2012, the Petitioner, by counsel, filed his Amended Petition for Writ of Habeas Corpus ad Subjiciendum, raising the following grounds:

1. A sentence of Five to Fifty years was Excessive and Disproportionate to the Character and Degree of the offense Pursuant to the Eighth Amendment of the United States Constitution and Article III, Section 5 of the West Virginia State Constitution.

2. The Petitioner's Guilty Plea was Involuntary because he was not educated about the exact nature and consequences of his plea by his counsel.

3. Sarah Harmon and David Smith, counsel for the Petitioner, were ineffective in their Representation.

4. The Petitioner was Incompetent at the time of the offense because he was under the influence of controlled substances.

5. The Petitioner's bail was excessive.

**C. The *Losh* Checklist**

Counsel also filed the *Losh* checklist on July 20, 2012, with grounds as follows:

**Inapplicable Grounds:**

In his *Losh* checklist the Petitioner found the following inapplicable:

- Lack of trial court jurisdiction.

- Unconstitutionality of statute under which conviction was obtained.

7

- Indictment showing on its face that no offense was committed.

- Prejudicial pretrial publicity.

- Denial of speedy trial right.

- Mental competency at time of tria(sic)/plea, cognizable even if not asserted at proper time, or if resolution not adequate.

- Incapacity to stand trial/enter into plea due to drug use.

- Language barrier to understanding the proceedings.

- Denial of counsel.

- Unintelligent waiver of counsel.

- Failure of counsel take an appeal.

- Coerced confessions.

- Suppression of helpful evidence by prosecutor.

- State's knowing use of perjured testimony.

- Falsification of a transcript by prosecutor.

- Information in pre-sentence report erroneous.

- Double jeopardy.

- Irregularities in arrest.

- No preliminary hearing.

- Illegal detention prior to arraignment.

- Irregularities or errors in arraignment.

- Challenges to the composition of grand jury, or to its procedures.

- Failure to provide copy of indictment to defendant.

- Defects in indictment.

8

- Improper venue.

- Pre-trial delay.

- Refusal of continuance.

- Refusal to subpoena witnesses.

- Prejudicial joinder of defendants.

- Lack of full public hearing.

- Non-disclosure of Grand Jury minutes.

- Refusal to turn over witness notes after witness has testified.

- Claims concerning use of informers to convict.

- Constitutional errors in evidentiary rulings.

- Instructions to the jury.

- Claims of prejudicial statements by trial judge.

- Claims of prejudicial statements by prosecutor.

- Sufficiency of evidence.

- Acquittal of co-defendant on same charge.

- Defendant's absence from part of the proceedings.

- Improper communications between prosecutor or witness and jury.

- Question of actual guilt upon an acceptable guilty plea.

- Amount of time served on sentence, to be served, or for which credit applies.

## Applicable Grounds:

The Petitioner asserted the following *Losh* grounds:

- Involuntary guilty plea.

- Mental competency at time of crime.

9

- Consecutive sentence for same transaction.

- Unfulfilled plea bargains.

- Ineffective assistance of counsel.

- Excessiveness or denial of bail.

- Claims of incompetence at time of offense, as opposed to time of trial.

- Severer sentence than expected.

- Excessive sentence.

- Mistaken advice of counsel as to parole or probation eligibility.

## D. The State's Answer to the Petition for Writ of Habeas Corpus

On September 24, 2012, the Respondent, by and through Assistant Prosecuting Attorney Janet Williamson, Esq., filed an Answer addressing the Petitioner's Petitions for Writ of Habeas Corpus. This pleading specifically answered each allegation raised by the Petitioner, and is set out in Section III.C., *infra.*

## E. The Omnibus Habeas Corpus Hearing

The Court conducted an Omnibus Habeas Corpus hearing in this matter on October 15, 2012. The Petitioner appeared in person and by counsel, Natalie Hager, Esq. The State of West Virginia appeared by Janet Williamson, Esq., her Assistant Prosecuting Attorney. The Court began by reviewing the scope and finality of this Habeas Corpus proceeding. The Petitioner stated that his counsel was adequately prepared for the hearing. Thereupon, the Court reviewed the *Losh* checklist to insure that the Petitioner had raised all grounds that were the basis for his claim. (Omnibus Habeas Corpus transcript at pp. 4-13).

10

The Petitioner called his trial counsel, Sarah Harmon, Esq., as a witness. The Petitioner waived the attorney-client privilege upon the advice of counsel. She discussed the plea in Mercer County, mentioning that the Petitioner was also charged in Monroe and Greenbrier County, West Virginia, and Giles County, Virginia. She testified that she explained to the Petitioner that he could get five (5) to fifty (50) years as a result of his plea. Ms. Harmon testified that her standard practice is to discuss the maximum sentence and the various sentencing options available to the Court. She did not remember telling him what his most possible sentence would be.

Ms. Harmon was sick on the day of Petitioner's sentencing, but understood that he received five (5) to fifty (50) years, i.e. one (1) to ten (10) years each on five (5) counts, to run consecutive with each other, but concurrent with all three of the other jurisdictions. Ms. Harmon filed a motion for reconsideration, which was denied.

She stated that the Petitioner had a $20,000.00 surety bond in Mercer County, a $20,000.00 cash only bond in Monroe County, and an extradition hold from Giles County, Virginia, during these proceedings.

During Ms. Harmon's cross-examination, the State introduced a letter from the Petitioner to her, dated October 23, 2009, which stated, in pertinent part, "I do understand that I have agreed to plea to information on 5 counts which is 5-50 years in prison." (Respondent's Exhibit 1, introduced at the Omnibus Habeas Corpus hearing of 10/15/12).

Ms. Harmon did not believe that the Petitioner had a viable mental health defense. She would have looked into it if he had such a defense. She stated that the Petitioner

11

acknowledged that he had committed these crimes, and was very remorseful for his actions.[1]

She knew that the Petitioner received a concurrent sentence in Monroe County, West Virginia, and that the Greenbrier County charges were dismissed. Ms. Harmon did not seek a bond reduction, because the Petitioner had a cash only bond in Monroe County, and was also held by a detainer from Virginia. She did not assert a mental defense because he said that while he did it to support his drug habit, he never said he was not responsible. (Omnibus Habeas Corpus transcript at pp. 14-33).

David Smith, Esq., was called as a witness by the Petitioner. He appeared at the sentencing, but did not remember much about the proceeding. (Omnibus Habeas Corpus transcript at pp. 33-35).

The Petitioner was called as a witness on his own behalf. He recounted his sentencing status from the several jurisdictions where he had charges pending. The Petitioner stated he committed the crimes to get drugs to feed his addiction. He knew he could possibly get five (5) to fifty (50) years, but he said that his lawyer thought he would get a little less, specifically, three (3) to thirty (30) years, but was very clear that he could get five (5) to fifty (50). He would not have pled if he knew for sure he was getting five (5) to fifty (50).

On the day he was sentenced he blacked out and it wasn't until several weeks later that he understood what had happened. He believed Ms. Harmon should have asked for the sentencing to be held in abeyance pending resolution of the matters in Giles County, Virginia.

---

[1] The Petitioner had a previous conviction for forgery and uttering, but the State did not seek a recidivist penalty.

12

On the date of sentencing, Mr. Smith did not ask the family to speak on his behalf. The Petitioner had previously served a two (2) to twenty (20) year sentence from Monroe County, from which he was paroled. He had originally been probated, but violated his probation and was sentenced to the penitentiary on the earlier charges.[2] (Omnibus Habeas Corpus transcript at pp. 35-48).

## III. DISCUSSION

### A. HABEAS CORPUS DEFINED

Habeas Corpus is a "suit wherein probable cause therefore being shown a writ is issued which challenges the right of one to hold another in custody or restraint." Syl. Pt. 1. *State ex rel. Crupe v. Yardley*, 213 W. Va. 335, 582 S.E.2d 782 (2003). The issue presented in a Habeas Corpus proceeding is "whether he is restrained of his liberty by due process of law." *Id. At* Syl. Pt. 2. "A Habeas Corpus petition is not a substitute for writ of error[3] in that ordinary trial error not involving constitutional violations will not be reviewed." *Id. At* Syl. Pt. 3.

### B. THE AVAILABILITY OF HABEAS CORPUS RELIEF

In *State ex rel. McCabe v. Seifert*, the West Virginia Supreme Court of Appeals delineated the circumstances under which a post-conviction Habeas Corpus hearing is available, as follows:

(1) Any person convicted of a crime and

(2) Incarcerated under sentence of imprisonment therefore who contends

---

[2] The two (2) to twenty (20) year sentences from which the Petitioner was paroled were in addition to and separate from the charges resulting in an additional two (2) to twenty (20) year sentence also received in Monroe County from the offenses contemporaneous with those at issue here.

[3] A writ of error issued by an appellate court to the court of record where a case was tried, requiring that the record of the trial be sent to the appellate court for examination of alleged errors.

13

(3) That there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both, or

(4) That the court was without jurisdiction to impose the sentence, or

(5) That the sentence exceeds the maximum authorized by law, or

(6) That the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common-law or any statutory provision of this State, may without paying a filing fee, file a petition for a writ of Habeas Corpus Ad Subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief. 220 W. Va. 79 640 S.E.2d 142 (2006); W. Va. Code §53-4A-1(a)(1967)(Repl. Vol. 2000).

Our post-conviction Habeas Corpus statute, W. Va. Code §53-4A-1 *et seq.*, "clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction Habeas Corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984). At subsequent Habeas Corpus hearings, any grounds raised at a prior Habeas Corpus hearing are considered fully adjudicated and need not be addressed by the Court. *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

Yet, some limited exceptions apply to this general rule: "[a] prior omnibus Habeas Corpus hearing is *res judicata* as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however an applicant may still

14

petition the court on the following grounds: (1) ineffective assistance of counsel at the omnibus Habeas Corpus hearing; (2) newly discovered evidence; (3) or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).[4]

A Habeas Corpus proceeding is civil in nature. "The general standard of proof in civil cases is preponderance of the evidence." *Sharon B.W. v. George B.W.*, 203 W. Va. 300, 303, 507 S.E.2d 401, 404 (1998).

The West Virginia Supreme Court of Appeals has articulated the way for a Circuit Court to review Habeas Corpus petitions: "Whether denying or granting a petition for a writ of Habeas Corpus, the circuit court must make adequate findings of facts and conclusions of law relating to each contention advanced by the petitioner, and state the grounds upon which the matter was determined." *Coleman v. Painter*, 215 W. Va. 592, 600 S.E.2d 304 (2004).

## C. FINAL LIST OF GROUNDS ASSERTED FOR ISSUANCE OF A WRIT OF HABEAS CORPUS, AND THE COURT'S RULINGS THEREON

The Court has carefully reviewed all of the pleadings filed in this action, the transcript of the omnibus hearing, the Court files in the underlying criminal action, the transcripts of the plea and sentencing hearings, and the applicable case law. The Court has also reviewed the *Losh* checklist filed by the Petitioner with his Amended Petition for Writ of Habeas Corpus.

---

[4] On June 16, 2006, the West Virginia Supreme Court of Appeals held that a fourth ground for Habeas relief may exist in cases involving testimony regarding serology evidence. To summarize, the Court held as follows:

> A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime serologist, other than a serologist previously found to have engaged in intentional misconduct, offered evidence may bring a petition for writ of Habeas Corpus based on the serology evidence even if the prisoner brought a prior Habeas Corpus challenge to the same serology evidence and the challenge was finally adjudicated.

*In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 633 S.E.2d 762, 219 W. Va. 408 (2006).

In his *Losh* checklist, the Petitioner asserted that this as an involuntary guilty plea, that he was not mentally competent at the time of the crime, that he received consecutive sentences for the same transaction, that his plea bargain was unfulfilled, that he received ineffective assistance of counsel, that he had an excessive bail and/or was denied bail, that he was incompetent at the time of the offense, as opposed to the time of trial, that he received a severer sentence than expected, that he received an excessive sentence, and that he received mistaken advice of counsel as to his parole or probation eligibility.

Therefore, the matters before this Court for review are:

(1)  Whether trial counsel was ineffective on the following grounds:

(a)  not claiming that the plea bargain was unfulfilled, and thus seeking its' enforcement;

(b)  allowing the Petitioner to enter into an involuntary plea;

(c)  not properly advising the Petitioner of his parole or probation eligibility;

(d)  not seeking a lower bail;

(e)  not seeking to delay his sentencing pending the resolution of his other charges.

2.  Whether the Petitioner was mentally incompetent at the time of the crime.

3.  Whether the Petitioner's sentence was disproportionate or illegal by virtue of it being consecutive and/or excessive and/or more severe than expected.

16

## 1. WAS COUNSEL INEFFECTIVE?[5]

### a. The Petitioner's Argument:

**THE PETITIONER'S GUILTY PLEA WAS INVOLUNTARY BECAUSE HE WAS NOT EDUCATED ABOUT THE EXACT NATURE AND CONSEQUENCES OF HIS PLEA BY HIS COUNSEL**

Rule 11 of the West Virginia Rules of Criminal Procedure governs procedure and guildelines for taking guilty pleas to ensure that criminal defendants are fully informed of the nature and consequences of their plea agreements. First a trial court must not accept a guilty plea from a defendant "without first,... addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promise apart from a plea agreement". W. Va. R. Crim. P. 11(d). The trial court must inform the defendant of, and determine that the defendant understands, the following information:

(1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; and

(2) If the defendant is not represented by an Attorney, that the defendant has the right to be represented by an Attorney at every stage of the proceeding and, if necessary, one will be appointed to represent the defendant herein; and

(3) That the defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that the defendant has the right to be tried by a jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, the right against compelled self-incrimination, and the right to call witnesses; and

(4) That if a plea of guilty or nolo contendere is accepted by the court there be not be a further trial of any kind, so that by pleading guilty or nolo contendere the defendant waives the right to a trial; and

---

[5] All Exhibit numbers in this section refer to the Exhibit numbers of the parties attached to their pleadings.

17

(5) The court intends to question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant has pleaded, that the defendant's answers may later be used against the defendant in a prosecution for perjury or false swearing.

Imperatively, when establishing whether a criminal defendant entered into his plea agreement knowingly and voluntarily, "a trial court should spread upon the record the defendant's education, whether he consulted with friends or relatives about his plea, any history of mental illness or drug use, the extent he consulted with counsel, and all other relevant matters which will demonstrate to an appellate court or a trial court proceeding in habeas corpus that the defendant's plea was knowingly and intelligently made with due regard to the intelligent waiver of known rights". _White v. Haines_, 215 W. Va. 698, 704, 601 S.E.2d 18, 24 (2004) (citing _Call v. McKenzie_, 159 W. Va. 191, 220 S.E.2d 665 (1975), internal citation marks omitted). Moreover, the trial court must then inquire whether the defendant's willingness to plead guilty stems from discussions between the prosecutor and the defendant, or the defendant's counsel. _Id._ If the trial court accepts the plea agreement, "the court shall inform the defendant that it will embody in the judgment and sentence the disposition provided for in the plea agreement". W. Va. R. Crim. P. 11(e)(3).

The Petitioner asserts that his previous counsel, Sarah Harmon, misrepresented the actual parole date to him before he pled guilty. Ms. Harmon explained that the trial court would, more than likely, give him a three (3) to thirty (30) year sentence for the felonies pled to, and that he would be eligible for parole in three years. The entire time, even shortly following sentencing, the Petitioner was under the strong impression that the trial court would run some of the (sic) his sentences concurrently, and that he would end up with a sentence of not less than three (3) nor more than

18

thirty (30) years in a penitentiary. The Petitioner wholly relied on his counsel's advice and guiding hand that he would not receive more than said sentence, even though in his heart of hearts he did understand that it could have been the maximum sentence, to-wit: five to fifty years in prison. However, Ms. Harmon assured the Petitioner that he would, more than likely, be sentenced given a concurrent sentence on some of the charges, and the Petitioner, fully trusting her, pled on information. Had he known or fully understood the ramification of his plea of guilty, he would have decided to wait it out and see if he was indicted by the Mercer County Grand Jury and if a better plea deal would be offered in circuit court down the road. However, believing that he was going to be sentenced to three (3) to thirty (30) years in a penitentiary, the Petitioner decided to enter into a guilty plea on information.

Accordingly, based on the foregoing, the Petitioner asserts that his guilty plea to one count of Fraudulent Scheme, two counts of Forgery, and two counts of Uttering was involuntary.

## SARAH HARMON AND DAVID SMITH, COUNSEL FOR THE PETITIONER, WERE INEFFECTIVE IN THEIR REPRESENTAETION

The Sixth Amendment of the United States Constitution, applied to the states through the Fourteenth Amendment, and Article Three Section Fourteen of the West Virginia State Constitution guarantee a criminal defendant the right to effective counsel. The threshold question in analyzing effectiveness of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result". *Strickland v. Washington*, 466 U.S. 668, 66, 104 S.Ct. 2052, 2064 (1984). In *Strickland*, the United States Supreme Court adopted a test that requires a defendant who claims

19

ineffective assistance of counsel to prove two components. First, the defendant must demonstrate the deficiency of his counsel's performance. Second, the defendant must prove that counsel's actions prejudiced him, thus denying him a fair trial. *Id.* The appropriate test for prejudice is a showing of existence of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". *Id.* at 694, 2068. Such reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome". *Id.* "The assessment of prejudice should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.*

West Virginia has adopted the two-prong test announced in *Strickland.* In fact, Justice Cleckley essentially paraphrased the two components of this test in Syllabus point 5 of *State v. Miller,* 194 W. Va. 3, 459 S.E.2d 114 (1995): "(1) Counsel's performance was deficient under an objective standard of reasonableness; (2) there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Justice Cleckley further emphasized that in examining ineffective assistance of counsel claims, courts must "at the same time refrain[ ] from engaging in hindsight or second-guess[ing] trial counsel's strategic decisions". Syl. P. 6. Instead, courts should focus on whether counsel's actions were in accord with the actions of a "reasonable lawyer . . . under the circumstances". *Id.*

The Petitioner asserts that his trial counsel, Sarah Harmon, was ineffective in several aspects. First, while she did file a Motion for Reconsideration of Sentence after the Petitioner was given a consecutive sentence of five (5) to fifty (50) years, she failed to request that Judge Swope hold the motion in abeyance while the Petitioner's

20

charges in all other counties are resolved. While she did ask for the Court to hold the motion in abeyance until the Greenbrier charges have been resolved, she had neglected to ask that this Court not rule upon the motion until the charges in Giles County were resolved. In fact, Ms. Harmon should have asked for the Court to hold the motion in abeyance instead asking for an "alternative" ruling if the Court decided not to reconsider the Petitioner's motion. In essence, Ms. Harmon should have specifically asked that the Court hold the motion in abeyance until all of the charges have been resolved. Judge Swope specifically stated that he may reconsider the sentence upon a Rule 35(b) motion once the Petitioner's cases in "surrounding jurisdictions" are resolved. (Exhibit A). At the hearing, Judge Swope discussed the Petitioner's involvement with Giles County as well, so he definitely meant Giles County to be one of the "surrounding jurisdictions". (Exhibit G).

On July 15, 2010, Ms. Harmon filed a Motion to Reconsider Sentence, getting it in within the 120 days allotted by Rule 35(b) of the West Virginia Rules of Criminal Procedure. At that time, the Petitioner had already pled guilty in Monroe County, West Virginia, and sentenced to two (2) to twenty (20) years in a penitentiary. However, his cases in Greenbrier County and the Commonwealth of Virginia were still pending. While Ms. Harmon was required to file the motion for reconsideration of sentence by July 15, 2010 to ensure its timeliness, she should have requested that Judge Swope hold the motion in abeyance until all cases against the Petitioner are resolved, and not just state that, "in the alternative, the Defendant requests that this Court hold this matter in abeyance until the Defendant's Greenbrier County charges are resolved. (Exhibit C).

21

The Petitioner pled guilty to Daytime Burglary and Breaking and Entering in Monroe County, West Virginia, and was sentenced to two (2) to twenty (20) years of incarceration on April 19, 2010. Judge Irons ordered that said sentence to be run concurrently with the sentenced (sic) imposed in Mercer County in the Criminal Action Number 10-F-07-DS. (Exhibit D). On June 1, 2011, the Petitioner was sentenced to ten (10) years on each of the four charges (two counts of Uttering and two counts of Forgery) in Giles County, Virginia. Judge Colin Gibb suspended nine (9) years and five (5) months on each charge, concurrent, for the Petitioner to be returned to West Virginia and serve his sentence. Once the Petitioner serves his sentence in West Virginia, he is to be returned to the New River Valley Regional Jail to serve his seven (7) month sentence. (Exhibit E). The Greenbrier charges against the Petitioner had been dismissed by the State of West Virginia on August 30, 2010, for failure to indict within the prescribed time period. (Exhibit F). Accordingly, the Petitioner's charges in other counties and the Commonwealth of Virginia had been resolved on June 1, 2011 at the latest. Certainly, Ms. Harmon's performance was deficient under the objective standard of reasonableness for failing to ask the court to hold the motion in abeyance until all cases are resolved; and there's reasonable probability that the result would have been different, to-wit: the Petitioner's sentence reconsidered. Thus, failure to request that Judge Swope hold said motion in abeyance until all cases are resolved was certainly ineffective assistance of counsel, and had she specifically asked for it, the result of the case would have been different.

Moreover, the Petitioner asserts that Sarah Harmon mistakenly advised him that only some of the sentences would be stacked, to-wit: she specifically stated that he

22

would, in all likelihood, receive a sentence of three (3) to thirty (30) years. Thus, she advised him that two of the sentences would run concurrently with the three of the sentences that would run consecutively with each other. The Petitioner, naturally, placed his full trust in his attorney, and was under the impression that he would be given a three to thirty year sentence. In fact, he was still under the impression that he would parole in three years even after he was placed at Southern Regional Jail following his sentencing hearing. Ms. Harmon advised him that he would be seeing the parole board in three (3) years after his sentencing hearing. However, the Petitioner is not due to appear before the parole board for another two and a half years simply because he was given a five to fifty year sentence. In fact, the Petitioner asserts that had he fully understood the ramifications of pleading guilty to five felonies, each of which carried a one to ten year sentence, he would have chosen to wait for indictments, and would not have pleaded guilty on information. The Petitioner asserts that he pled guilty on information because he was misled by his trial counsel as to his eligibility for parole and the amount of his sentence. Accordingly, Ms. Harmon's performance was deficient under the objective standard of reasonableness; and there is reasonable probability that the result would have been different if it were not for counsel's errors. Specifically, had Ms. Harmon explained to the Petitioner in detail that by pleading guilty to five felonies, he could be sentenced to five to fifty years in a penitentiary, the Petitioner would have waited to be indicted and would have waited for a possible plea offer in circuit court.

The Petitioner further asserts that Ms. Harmon did not file a motion for bond reduction, given the fact that the Petitioner's bond was set at $20,000 cash with the

23

condition of home confinement. Hence, the Petitioner spent a great amount of time in jail, whereas he could have met a lesser bond had Ms. Harmon intervened on his behalf. Therefore, based on the foregoing, the Petitioner contends that Ms. Harmon's performance was deficient under an objective standard of reasonableness; and there is reasonable probability that, but for Ms. Harmon's unprofessional errors, the result of the proceedings would have been different, to-wit: the Petitioner's bond would have been reduced to an amount that he could afford.

Finally, the Petitioner asserts that David Smith, instead of Sarah Harmon, appeared in circuit court representing him at the sentencing hearing. He further asserts that David Smith failed to speak with the Petitioner prior to the sentencing hearing and inquire of any ground the Petitioner wished to be mentioned to the judge on his behalf before the pronouncement of his sentence. Mr. Smith further did not inquire whether the Petitioner wished to have anyone speak on his behalf, and what exactly the Petitioner wanted his attorney to say to the judge before a life-changing sentence was imposed. Moreover, Ms. Harmon had failed to inform the Petitioner that David Smith was going to appear in court on this crucial day of the Petitioner's life.

Accordingly, based on the foregoing, Ms. Harmon and Mr. Smith's performance as the Petitioner's counsel was deficient under the objective standard of reasonableness; and, but for counsel's errors, in all reasonable probability, the result of the proceedings would have been different. Specifically, the Petitioner would have waited with his decision to take a guilty plea had he known that he would be sentenced to five to fifty years in a penitentiary. Indeed, the Petitioner blindly relied

24

on the guiding hand of his counsel, Ms. Harmon, and truly believed to the day he was already in Southern Regional Jail that he would parole in three instead of five years. The three to thirty-year sentence was so deeply ingrained in his mind that he wholeheartedly perceived that he would parole in 2012, given credit for time served.

## THE PETITIONER'S BAIL WAS EXCESSIVE IN NATURE

The Petitioner contends that the $20,000 cash only bail was certainly excessive. The felonies were non-violent in nature, and there was no evidence that the Petitioner would present himself to be a flight risk. There is no evidence in the file to show that Mr. (sic) Harmon had ever filed a motion to reduce bond, and consequently the Petitioner had spent a significant amount of time in jail awaiting his hearings, simply because neither he nor his family had $20,000 in cash to post his bond. Accordingly, the Petitioner contends that his $20,000 cash only bond with the condition of home confinement was highly excessive.

## b. The State's Response:

## PETITIONER'S GUILTY PLEA WAS VOLUNTARY

Petitioner fails to allege any valid constitutional violation. Petitioner voluntarily entered a guilty plea as reflected in the plea colloquy and the plea papers Petitioner signed. Petitioner's counsel did not misrepresent the consequences of his sentence. The Court clearly spelled out that Petitioner was facing four one to tens, thirty two years on the misdemeanor bargained for one one to ten plus five years.

25

# COUNSEL FOR PETITIONER WAS NOT INEFFECTIVE

Petitioner fails to allege any valid constitutional violation. Petitioner voluntarily entered a guilty plea as reflected in the plea colloquy and the plea papers Petitioner signed. Petitioner's counsel did not misrepresent the consequences of his sentence.

Petitioner can not meet either component of the *Strickland* test. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)[6], the Supreme Court defined the burden a defendant must carry in order to successfully bring an ineffective assistance of counsel claim:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064.

> To establish that counsel's conduct was deficient, the defendant must show counsel's specific acts or omissions which, viewed from the perspective of counsel at the time of trial, fell below the standard of reasonable professional assistance." *United States v. Payne*, 741 F.2d 887, 891 (7th Cir. 1984) (citing *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066). Acts or omissions of counsel are outside the range of professionally competent assistance when "counsel's representation [falls] below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S.CT. at 2064-65. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance; that is, that defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial

---

[6] Adopted by *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

strategy.'"[I]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. at 2065 (citation omitted) (emphasis added).

Prejudice to the defendant, the second element necessary to a finding of ineffective assistance, will be found only if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner can not show that any sentence would have been different had his counsel requested the Court hold sentencing in abeyance until all his pending sentences were resolved. This would have been impossible since the Mercer County would not have released Petitioner to Virginia before his charges in Mercer County were resolved.

Petitioner's claim that Ms. Harman's failure to file a bond reduction is preposterous and warrants no response.

## PETITIONER'S BAIL WAS NOT EXCESSIVE

By his guilty plea, Respondent waived all pre-trial defects. Petitioner was not a resident of Mercer County. Petitioner had a lengthy criminal history allegedly fueled by his substance abuse problem. He was facing multiple felony charges in five different jurisdictions *and a detainer was placed on him by Virginia.* Petitioner's claim that Ms. Harman's failure to file a bond reduction is preposterous and warrants no further response.

27

**c. The Court makes the following specific findings of fact and conclusions of law regarding the Petitioner's claim of Ineffective Assistance of Counsel:**

(1) The Court **FINDS** that the West Virginia Supreme Court of Appeals stated the test to be applied in determining whether counsel was effective in *State v. Miller*:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 764 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), syl. pt. 5.

(2) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> Where counsel's performance attacked as ineffective arises from occurrence involving strategy, tactics, and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of the accused. *State ex rel Humphries v. McBride*, 220 W.Va. 362, 645 S.E.2d 798 (2007) syl. pt. 5. In accord, Syllabus point 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

(3) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> [i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstance, the identified acts omissions were outside the broad range of professionally competent assistance while at the

28

same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995) syl. pt. 6.

(4) The Court **FINDS** that on the issue of bail, West Virginia Code §62-1C-1(a) states that:

A person arrested for an offense not punishable by life imprisonment shall be admitted to bail by the court or magistrate. A person arrested for an offense punishable by life imprisonment may, in the discretion of the court that will have jurisdiction to try the offense, be admitted to bail.

(5) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

Where, before conviction, admitting the accused to bail rests with the discretion of the court, this discretion should be guided by two principles, namely: If released on bail, will the accused probably appear at the time and place required to stand trial, and if released on bail, does it appear probable that the accused will commit other crimes.

and

29

In exercising its discretion in admitting the accused to bail consideration should be given to all facts and circumstances of each case and no absolute rule or policy should be adopted, nor should one circumstance be considered to the exclusion of all facts which should be considered.

*State ex rel Ghiz v. Johnson,* 155 W. Va.186, 183 S.E.2d 703 (1971). Syll. Pt. 1 and 2.

(6) The Court **FINDS** that the West Virginia Rules of Criminal Procedure state that:

When a presentence investigation and report are made under subdivision (b)(1), sentence should be imposed without unnecessary delay following completion of the process prescribed by subdivision (b)(6). When a presentence investigation and report are not made, sentence shall be imposed without unreasonable delay.

*West Virginia Rules of Criminal Procedure* 32(a)

(7) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

Sentence shall be imposed without unreasonable delay; however, the passage of time along will not bar imposition of sentence or require a defendant's

30

discharge. Delay must not be purposeful or oppressive; deprivation of rights depends upon the particular circumstance of each case.

*Ball v. Whyte*, 170 W. Va. 417, 294 S.E.2d 270 (1982)

(8) The Court **FINDS** that the following colloquy took place during the Petitioner's guilty plea on February 3, 2010:[7]

THE COURT: All right. Now gentlemen, as to each of you -- this is back to you, too, Mr. Weikle. As to each of your respective pleas, is this the full and complete plea bargain agreement between you and the State?

Mr. Weikle?

DEFENDANT WEIKLE: Yes, Your Honor.

(*See* Plea Transcript at p. 22, L:14-20);

Further:

Mr. Weikle, is this what you want to do?

DEFENDANT WEIKLE: Yes, sir.

THE COURT: I mean, that's what I'm saying. In other words, Ms. Harmon didn't just go there and make a deal and say you're pleading to this.

DEFENDANT WEIKLE: Oh, no.

---

[7] With permission of the parties and counsel, the Court took guilty pleas from the Petitioner and another criminal defendant at the same time, explaining the plural tense used in several questions. The Court received individual answers from each defendant.

31

THE COURT: Because people tell me that all the time. "I didn't tell my lawyer to do that. I was forced to do this." You weren't forced to do this, were you?

DEFENDANT WEIKLE: Oh, no.

THE COURT: This is what you want?

DEFENDANT WEIKLE: Yes, Your Honor.

(*See* Plea Transcript at p. 23, L:4-16);

Further:

THE COURT: Is anyone forcing either one of you to plead guilty?

DEFENDANT WEIKLE: No, sir.

(*See* Plea Transcript at p. 37, L:21 – p.38, L:1);

Further:

THE COURT: Have any promises been made to you other than what's contained in the plea agreement and what's been stated here in open court?

Mr. Weikle?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: Hear that again. Have any promises been made to you, other than what's in plea agreement and what's been stated here in open court?

DEFENDANT WEIKLE: No, Your Honor.

(*See* Plea Transcript at p. 58, L:5-13);

32

Further:

THE COURT: Is your offer to enter this plea your free and voluntary act and are you entering this plea of your own freewill?

DEFENDANT WEIKLE: Yes, sir.

(*See* Plea Transcript at pp. 58, L:21 – p.59, L:2);

Further:

THE COURT: Next is the Petition to Plead Guilty, an 8½ x 11 white piece of paper, and the Defendant's Statement in Support of Guilty Plea. It's the front and back of two pieces of paper and the front of a third, so it's five pages long. It's on orange paper, it's got seventy-three questions. Have you seen these two forms before, sir?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: Did you go over these forms with Ms. Harmon?

DEFENDANT WEIKLE: Yes.

THE COURT: Did you have any questions about anything on either one of those forms?

DEFENDANT WEIKLE: No.

THE COURT: If you had any questions, did she answer them or explain them to your satisfaction?

DEFENDANT WEIKLE: Yes, Your Honor.

33

THE COURT: So do you understand everything on those forms, all your rights and what you're giving up?

DEFENDANT WEIKLE: Yes, sir.

THE COURT: Now did you fill these forms out or did she fill them out for you?

MS. HARMON: It's a mixture, Your Honor.

THE COURT: Both? All right. Regardless of who wrote the stuff down there, they're your answers. Right?

DEFENDANT WEIKLE: Yes, sir.

THE COURT: Did you sign the Petition on the bottom of the back of the second page there?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: We'll make that a part of the record.

Did you sign the bottom of each of those five places on Defendant's Statement in Support of a Guilty Plea?

DEFENDANT WEIKLE: Yes, sir.

THE COURT: We'll make that a part of the court file.

(*See* Plea Transcript at p. 67, L:1 – p.68, L:17);

Further:

Last is the actual plea of guilty. It's the front and back of an 8½ x 11 white piece of paper. Have you seen that form before?

DEFENDANT WEIKLE: Yes, sir.

THE COURT: Did you go over that form with your attorney, Ms. Harmon?

DEFENDANT WEIKLE: Yes.

THE COURT: Did you have any questions about anything in that form?

DEFENDANT WEIKLE: No, sir.

THE COURT: If you had any questions, did she answer or explain those to your satisfaction?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: So again, do you understand everything on that form, all your rights and what you're giving up?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: Now did you fill that out or did she fill it out for you?

DEFENDANT WEIKLE: Filled it out for me.

THE COURT: But they're your answers. Right?

DEFENDANT WEIKLE: Yes, sir.

THE COURT: All right. Did you sign it on the bottom of the front page?

DEFENDANT WEIKLE: Yes.

THE COURT: All right. Flip it over. If this is what you want to do, you need to sign right there where the bailiff's showing you and you can have a seat.

35

*(See* Plea Transcript at p. 69, L:1 – p.70, L:8);

Further:

THE COURT: All right. Now this is back to both of you all again.

So is each of you satisfied with the manner in which your respective attorneys, Ms. Harmon and Mr. Evans, have represented you in your respective case?

DEFENDANT WEIKLE: Yes, Your Honor.

*(See* Plea Transcript at p. 84, L:6-12);

Further:

THE COURT: Do you feel there is anything either of them failed to do in representing you?

DEFENDANT WEIKLE: No, Your Honor.

*(See* Plea Transcript at p. 84, L:14-16);

Further:

THE COURT: Did they do anything in your respective case you did not want them to do?

DEFENDANT WEIKLE: No, Your Honor.

*(See* Plea Transcript at p. 84, L:18-20);

Further:

THE COURT: Do you have any complaints at all about the manner each of them represented you in your respective case?

DEFENDANT WEIKLE: No, Your Honor.

36

(*See* Plea Transcript at p. 84, L:22 – p. 85; L:3)

(9) The Court finds that prior to the guilty plea hearing the Petitioner completed certain plea agreement documents which contain materials relative to the above-referenced assertion, specifically, the Defendant's Statement in Support of Guilty Plea, Petition and Plea of Guilty:[8]

**Question & Answer**

**DEFENDANT'S STATEMENT IN SUPPORT OF GUILTY PLEA**

(14) If there are other offenses charged in this Information, what is the maximum penalty for each such included offense?                                                    **n/a**

(15) Are you prepared to plead to this Indictment, or to any charge of crime contained therein?                      **Yes**

(42) Do you plead guilty of your own free will?      **Yes**

(43) Do you believe yourself to be guilty?               **Yes**

(44) Describe briefly your participation in the crime:

> **I forged and uttered checks that were not mine, to buy drugs**

(47) Do you plead guilty, after receiving and considering the advice of your attorney?                                   **Yes**

(48) Do you know and understand that the decision to plead guilty must be made by you along, regardless of what

---

[8] The Court has attached the complete plea agreement as Exhibit 1 to this Opinion Order.

37

your attorney might have told you, and that you must accept the full responsibility of your decision to plead guilty in this case? **Yes**

(65) Are you satisfied with the services your attorney has given you in this case? **Yes**

Is there anything that she has done, or which she has failed to do for you that you desire to discuss with the Court in private before your plea is accepted? **No**

(68) Is there any question in your mind about his proceeding that you want to ask before your plea is accepted? **No**

(69) Do you know and understand that your decision to plead guilty is final and that your plea may not be withdrawn for any reason after it is accepted? **Yes**

(70) Have you truthfully and fully answered all of these questions? **Yes**

(10) The Court finds that the following testimony was given by Sarah Harmon, Esq. at the Omnibus Habeas Corpus hearing on the issue of the voluntariness of the Petitioner's plea and ineffective assistance of counsel:

Q Did you at some point represent Justin Weikle?

A I did.

38

Q And he's the petitioner in this proceeding. You represented him. Do you remember when you represented him?

A I believe it was probably a few months after I came to the Public Defender's Office in 2009.

(See Omnibus Habeas Corpus transcript at p. 14, L:20 – p. 15, L:4)

Q What type of case was it?

A I believe it started out in magistrate court as four forgeries, four utterings and one attempt to utter.

Q Were you appointed or retained?

A I was appointed.

Q And what — what was the nature of the offense in that case?

A The nature of the offense?

Q Uh-huh. The offense.

A Well it was my — my recollection of the case — it's been a while — that a checkbook was stolen in Monroe County. The allegation was that he stole that from a business owned by his family members. He stole that and then he came to Mercer County and used the checks and the credit card.

39

There was some uncharged offenses in magistrate court that would have included — I believe it was 26 more misdemeanors for the use of the credit card.

So a plea was offered by Information to one forgery and one uttering on each victim, so two forgeries, two utterings, and one felony to make up for the 26 misdemeanors of fraudulent schemes.

Q Fraudulent schemes. Okay. So a total of five felonies?

A Yes, ma'am.

Q Okay. So he decided to take a plea on an Information?

A Yes, ma'am.

Q Did he — at the time this was happening, did he also have pending charges in other counties?

A Yes, ma'am.

Q What counties, if you remember.

A Monroe, Greenbrier, a Virginia county, possibly Giles.

Q Okay. And do you remember at that time when the took the plea if the charges in Monroe, Greenbrier and Giles county were resolved?

A I think they were all still pending when he took the plea.

Q Okay. And at the time when you were going over the paperwork with him, did you explain to him what his possible sentence could be?

A Yes, ma'am. Well, when he initially decided he wanted to take the plea was at the prelim.

Q Okay.

A We didn't go over anything at that time. We went over it later.

Q So you actually did not go over the plea agreement at the preliminary stage? You didn't explain to him what the plea offer was?

A I explained to him what the plea offer was. I didn't go over all the paperwork and go -- it wasn't a huge discussion at that point. We were in the holding cell at the magistrate court.

(*See* Omnibus Habeas Corpus transcript at p. 16, L:7 – p. 18, L:17)

Q Do you remember what his sentence was? What he was sentenced to?

A I was not at the sentencing hearing. I've seen the sentencing order, and I believe he got the 5 to 50, but he got concurrency with all three of the other jurisdictions.

Q  Do you remember why you were not at the sentencing hearing?

A  I was ill.  Actually I — let me clarify that.  I believe I was ill.  My records aren't very clear.  It wasn't a scheduled out.  It was either myself or one of my children that was ill.

Q  Okay.  And do you remember who did represent him —

A  It was David Smith.

Q  David Smith?

A  Uh-huh.

(See Omnibus Habeas Corpus transcript at p. 20, L:12 – p. 21, L:5)

Q  Do you remember what the Defendant — what the Petitioner's bond was?

A  Yeah.  He was on a $20,000 surety bond in Mercer County.  He was on a $20,000 cash only bond in Monroe County.  I don't recall what he was on in Greenbrier County, and had an extradition hold out of Giles.

Q  Okay.  Did you file a Motion for Bond Reduction?

A  While I don't have a specific recollection of this conversation, I have in my notes that I spoke with the bond

42

officer to ask if they wanted to put him on the docket. The pre-trial officer. Apparently it was not scheduled. I think it would have been moot considering he had a hold out of Giles County and a $20,000 cash only bond that he hadn't meet. So no, I did not push for a bond hearing. I didn't think it would be useful.

(See Omnibus Habeas Corpus transcript at p. 24, L:14 – p. 25, L:8)

(11) The Court finds that at the Omnibus Habeas Corpus hearing the following testimony was given by David Smith, Esq. on the issue of ineffective assistance of counsel:

Q  Did you represent the Petitioner at sentencing?

A  Yes.

Q  And do you remember how much time you spent talking to him before the actual sentencing hearing?

A  No.

Q  You don't remember how much time you spent with him?

A  No.

Q  Was the day of the hearing the first time you met the Petitioner?

A  I believe so.

Q  Did you ask him if he wanted anybody to speak on his behalf at the sentencing hearing?

43

A  I don't remember.

Q  Do you remember any family members coming and talking with you that they wanted to speak on his behalf?

(See Omnibus Habeas Corpus transcript at p. 34, L:6 – p. 35, L:2)

(12)  The Court finds that at the Omnibus Habeas Corpus hearing the following testimony was given on the issue of ineffective assistance of counsel by Justin Kasey Weikle:

Q  Okay.  Now did Ms. Harmon file a Motion for Reconsideration on your behalf?

A  Yes, ma'am.

Q  And were the cases in the other counties resolved at that time?

A  Just the Monroe County.

Q  Just Monroe County.

Do you believe that there was something that Ms. Harmon should have done that she didn't do?

A  I think she should have asked the judge to hold it in abeyance until Giles County was resolved also.

Q  That she didn't ask or did ask?

A  That she should have asked.

Q  Should have asked.  Okay.

(See Omnibus Habeas Corpus transcript at p. 42, L:3-17)

44

Q And did Ms. Harmon represent you at sentencing?

A No, ma'am.

Q Now who represented you at sentencing?

A Mr. Smith.

Q Did Mr. Smith talk to you prior to sentencing?

A No, ma'am.

Q All right. I mean, did he say anything?

A I was told to sit down next to him. I was looking for Ms. Harmon. He said, "I'm David Smith. Ms. Harmon can't be here today. I'm representing you."

Q Did you have an opportunity to tell him what you wanted to be said on your behalf?

A No, ma'am.

Q Did you have family members come to your sentencing?

A Yes.

Q Who did you have?

A My wife and my grandmother.

Q Now did they approach Mr. Smith to your knowledge?

A No, ma'am.

Q Did Mr. Smith approach them, to your knowledge?

A No, ma'am.

Q Is there anything that you believe Mr. Smith could have done differently that he didn't do?

A   Ask the judge if my family could speak on my behalf.

They could have said some positive things about me.

MS. HAGER: I have nothing further.

(See Omnibus Habeas Corpus transcript at p. 43, L:2 – p. 44,

L:11)

Q   And your bond was set at $20,000?

A   Yes, ma'am.

Q   Could you meet that bond?

A   Possibly.  Probably not, though.

Q   All right.  And there was some testimony that she didn't

pursue the bond reduction.  Correct?

A   Yes.

(See Omnibus Habeas Corpus transcript at p. 42, L:18 – p. 43,

L:1)

(13)   The Court **FINDS** that the Petitioner was well represented by trial counsel in the negotiation of this plea agreement.

(14)   The Court **FINDS** that the Petitioner knowingly, intelligently, voluntarily and with the advice of competent counsel entered his pleas of guilty as aforesaid.

(15)   The Court **FINDS** that the Petitioner received the benefit of the bargain, in that the other jurisdictions either dropped their charges (Greenbrier), ran their sentence concurrently with Mercer County's (Monroe) or substantially reduced the actual

46

confinement in jail while running their sentences concurrently with each other (Giles County with West Virginia).

(16) The Court **FINDS** that, as required by law, the Petitioner was sentenced by this Court without unreasonable delay.

(17) The Court **FINDS** that the Petitioner had no right to have his sentence in the Circuit Court of Mercer County delayed to await sentencing in other jurisdictions.

(18) The Court **FINDS** that the Petitioner's claim that his counsel should have sought a lower bond is without merit, as he was under a substantial bond from Monroe County in addition to the bond for his Mercer County charges, and moreover, was held by a detainer filed by Giles County, Virginia.

(19) The Court **FINDS** and concludes that the Petitioner's claim that he received ineffective assistance of counsel for the reasons set forth , *infra*, is without merit.

## 2. WAS THE PETITIONER INCOMPETENT AT THE TIME OF THE OFFENSE?

### a. The Petitioner's Argument:

**THE PETITIONER WAS INCOMPETENT AT THE TIME OF THE OFFENSE BECAUSE HE WAS UNDER THE INFLUENCE OF CONTROLLED SUBSTANCES**

Under the West Virginia common law, a diminished capacity defense based on a mental illness or defect is available to criminal defendants to introduce expert testimony on that mental disease or defect that rendered the defendant incapable to

47

form the requisite mental state at the time of the criminal act. *State v. Joseph*, 214 W. Va. 525, 590 S.E.2d 718 (2003). In the case at bar, the petitioner lacked the requisite mental state to commit the crimes due to his diminished capacity. The Petitioner was under the influence of controlled substances during the commission of the alleged crimes. He could not form a mental state that is the element of Fraudulent Scheme – "unlawfully and feloniously employing a common scheme or plan to deprive the Bank of Monroe County in Union of money, goods, property, or services of a value of $1,607.21 by means of fraudulent pretenses, representations or promises, by presenting worthless check to Wal-Mart and Allen's Supermarket located in Mercer County and receiving United State Currency, goods, or services in return". Clearly, his mind was clouded by the influence of controlled substances where he could not possibly "employ a common scheme or plan" to deprive the Monroe County Bank of its money. The offenses of Forgery involve intent as one of the crucial elements of as well: "with <u>intent</u> to defraud, deceive and injure the said Richard Weikle". The offenses of Uttering are also crimes of intent: "by knowingly, unlawfully, feloniously, and <u>with intent to defraud</u>. . ." Certainly, the Petitioner, whose mind was impaired by controlled substances, lacked the ability to form such intent in any of these crimes, and thus, has a diminished capacity defense.

**b. The State's Response:**

**PETITIONER WAS NOT INCOMPETENT AT THE TIME OF THE OFFENSE**

By his guilty plea, Respondent waived all pre-trial defects.

48

**c. The Court makes the following specific findings of fact and conclusions of law regarding the claim that the Petitioner was not mentally competent at the time of the offense:**

(1) The Court finds that, on the issue of competency to stand trial, the West Virginia Supreme Court of Appeals held in *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976), that:

> No person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him. Syl. Pt. 1

(2) The Court finds that the West Virginia Supreme Court of Appeals has also held that:

> It is a fundamental guarantee of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent. *State v. Hatfield*, 186 W.Va. 507, 413 S.E.2d 162 (1991), Syl. Pt. 6, *following State v. Cheshire*, 170 W.Va. 217, 292 S.E.2d 628 (1982). Syl. Pt. 1

(3) The Court finds that the West Virginia Supreme Court of Appeals has also held that:

> When a trial judge is made aware of possible problem with defendant's competency, it is abuse of discretion to deny a motion for a psychiatric evaluation. *State v. Hatfield, supra* at Syl. Pt. 2, *citing* Syl. Pt. 4, in part, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980).

(4) The Court finds that the West Virginia Supreme Court of Appeals has also held in *State v. Sanders*, 209 W.Va. 367, 549 S.E.2d 40 (2001):

49

Importantly, since the right not to be tried while mentally incompetent is subject to neither waiver nor forfeiture, a trial court is not relieved of its objection to provide procedures sufficient to protect against the trial of an incompetent defendant merely because no formal request for such has been put forward by the parties . . . In other words, a trial court has an affirmative duty to employ adequate procedures for determining competency once the issue has come to the attention of the Court, whether through formal motion by one of the parties or as a result of information that becomes available in the cause of criminal proceedings.

In the *Sanders* decision, the Court confirmed its process for determining whether a broad inquiry into a defendant's mental competency is constitutionally required:

Evidence of irrational behavior, a history of mental illness or behavioral abnormalities, previous confinement for mental disturbance, demeanor before the trial judge, psychiatric and lay testimony bearing on the issue of competency, and documented proof of mental disturbance are all factors which a trial judge may consider in the proper exercise of his (or her) discretion (to order an inquiry into the mental incompetence of a criminal defendant.) *Sanders*, Syl. Pt. 6, *following* Syl. Pt. 5, *State v. Arnold*, 159 W.Va. 158, 219 S.E.2d 922 (1975).

(5) The Court finds that in *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976).

The West Virginia Supreme Court of Appeals has also held that:

"When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law, and it is error for the trial court to give an instruction on the issue of insanity which imposes a different test or which is not governed by the evidence presented in the case."

50

(6) The Court finds that the West Virginia Supreme Court of Appeals has held also, as to the burden of proof when a criminal defendant claims lack of criminal responsibility that:

> "There exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden of proof is one the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense." Syl. Pt. 2, *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979).

(7) The Court finds that the following colloquy took place during the Petitioner's guilty plea on February 3, 2010:

THE COURT: Gentlemen — ladies rather — counsel, is there any history of insanity, intoxication, diminished capacity — or rather any defense of mental illness, intoxication or diminished capacity in your respective client's case?

Ms. Harmon?

MS. HARMON: No, Your Honor.

(*See* Plea Transcript at p. 57, L:1-7);

Further:

THE COURT: What would the State's evidence be if you went to trial?

I want you to listen to this now.

MR. SITLER: Your Honor, if this case went to trial, the State's evidence would show that on August 5th Mr. Weikle went to

51

Wal-Mart in Princeton, West Virginia and forged check number 1281 for $266.40 on the account of Richard Weikle without his permission.

On the same date he went to Wal-Mart in Princeton and uttered check number 1284 in the amount of 188.68 on the account of Richard Weikle without his permission.

Ten days later on August 15th he went to Allen's Supermarket on Route 20, Oakvale Road and forged and uttered check number 25816 in the amount of $389.77 on the account of Weikle Brother's Lumber without their permission.

On Sunday, August 16th he returned to Allen's Supermarket and forged and uttered check number 25818 in the amount of $395.28 again on the account of Weikle Brother's Lumber, without their permission.

On Monday August 17th, he went to the Allen's Supermarket to cash check number 25841 in the amount of $367.08 on Weikle Brother's Lumber account. He forged the check, attempted to utter it and was arrested by Captain Powell of the Princeton Police Department on outstanding warrants from Monroe County related to the same stream of events.

The officer on that same date met with the Defendant at the Princeton Police Department, advised him of his Miranda rights, obtained an audio recorded statement in which he

52

admitted forging and uttering the checks on the account of Richard Weikle and Weikle Brother's Lumber as well as attempting to utter the check at the time he was apprehended. That would be the State's evidence.

THE COURT: All right. You heard what the Prosecutor said the State's evidence would be. Is that what happened?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: All right. So are you entering this plea because you're in fact guilty?

What do you want to say?

MS. HARMON: Your Honor, may I speak just quickly for the record.

This agreement was not made with Mr. Sitler. It was made with another prosecutor. The fraudulent scheme does not arise out of those incidents. The fraudulent scheme arises because he was also charged with using the credit card of Linda Weikle on numerous occasions. That was going to be a series of misdemeanors, I believe thirty-two misdemeanors, and those were never formally charged. We agreed to go by information to do one felony as opposed to thirty-two misdemeanors.

THE COURT: And is that agreeable with the State?

MR. SITLER: That's fine, Your Honor.

53

THE COURT: Is that what happened?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: You took the credit card and you ran it up all over these places. Right?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: You probably got what, up to a year on each one of them? You can get up to a year on each one of them?

MS. HARMON: Yes, Your Honor.

THE COURT: So in other words, you traded thirty-two misdemeanor one year sentences for one potential one-year sentence. Is that right?

MS. HARMON: Yes, Your Honor.

THE COURT: So are you entering this plea of guilty, as we said, because you're in fact guilty?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: Before I accept your guilty plea, Ms. Harmon, having consulted with your client, after investigating this case, having talked to the Prosecuting Attorney's office, having heard the representation of the State with respect to the evidence, knowing the facts and circumstances surrounding this case, can you see any advantage to your client if this case proceeded to trial?

MS. HARMON: No, Your Honor.

54

THE COURT: Do you know of any meritorious defense you would have if the case proceeded to trial?

MS. HARMON: No, Your Honor.

THE COURT: Do you feel it's in his best interest for me to accept this plea pursuant to the plea agreement in this case?

MS. HARMON: Yes, Your Honor.

(*See* Plea Transcript at p. 70, L:10 – p. 74, L:13)

(8) The Court finds that the aforementioned plea documents discussed *infra*, contained the following questions and answers concerning the defendant's mental capacity at the time of the crime, specifically:

**Question & Answer**

**DEFENDANT'S STATEMENT IN SUPPORT OF GUILTY PLEA**

(18) Have you been treated at any time for any mental Illness? **Depression**

(19) Are you under treatment now?

No

(20) Have you ever been addicted to drugs, that is, "hooked" On drugs? **Yes**

(21) Are you now under the care of any physician for any physical or mental disorder of any kind? **No**

55

(22) Have you been under the influence of any drugs or alcohol or other stimulants while completing this questionnaire? **No**

(27) Is you recollection impaired in any way? **No**

(45) Have you discussed the matters and things which, cause you to believe that you are guilty with your attorney,

**Sarah Harmon** **Yes**

(46) Have you discussed with your attorney, every fact or circumstance that would have any bearing upon your guilt or innocence; that is, have you told your attorney everything you know about this case? **Yes**

(9) The Court finds that the following testimony was given at the Omnibus Habeas Corpus hearing on the issue of the Petitioner's mental competency at the time of the offense by Sarah Harmon, Esq.:

Q Did you discuss with him any diminished capacity defense?

A He — he never indicated to me, and it's my recollection that — well, I know this was a case where there was a full confession given. It's my recollection that he did not deny the charges. He never said I don't remember committing the crime.

56

I mean, if someone comes to me and says I was so out of my head that I don't remember committing this crime, then obviously I'd look at that.

A large percentage of my clients have drug addictions. The simply (sic) fact there's a drug addiction is not normally enough to argue there was an incompetency issue.

He never told me he was too high to know what he was doing. He did indicated he had a drug problem.

Q Did he admit to you that he stole the credit card and the checkbook from his family's business and then take them and use them in Mercer County?

A He said that the charges were accurate. As a matter of fact, this was all agreed to early. The very first time I talked to him at the prelim, he was just adamant that he did it, he just wanted to get it over with, if that's what they thought was best he'd take it. And then for a while he decided he did not want to take the plea, when we got the Indictment, he just came back and so no, I just want to get it over with.

Q So if he now claims he was too high or under the influence because of a substance abuse problem when he took the checks or issued — or uttered them and forged them and used the credit card, what would you have done with that defense?

57

A      If they have a defense, I look into it.

Q Is it your recollection today that he told you he did not remember writing these checks —

A No.

Q — forging them, uttering them, —

A No.

Q — or using the credit card?

A No. He did say he had a drug problem and his drug problem was the motivating factor for the crime. He never indicated to me that he was so high he didn't remember what he was doing. He was actually very remorseful for his actions, I mean, the whole time I talked to him.

MS. WILLIAMSON: Thank you. That's all.

THE COURT: All right. Any other questions, Ms. Hager?

MS. HAGER: No, sir.

(See Omnibus Habeas Corpus Transcript at p. 27, L:9 - p. 29, L:14);

Further:

THE COURT: All right. And you never had any feeling whatsoever that he didn't know what he was doing at the time of the offense, wasn't responsible.

THE WITNESS: That issue was never raised. It was a coherent confession, and what he was saying to me was

58

remorse for what he had done. He did say he did it to support

his drug habit. He never said he was in drug-induced --

(See Omnibus Habeas Corpus Transcript at p. 32, L:1-8)

(10) The Court finds that at the Omnibus Habeas Corpus hearing

the following testimony was given by Justin Kasey Weikle

on the issue of his mental competency at the time of the

alleged offense:

Q And — okay. Now let's talk about the under the influence

situation.

Were you under the influence when all this occurred in

Mercer County?

A Yes, ma'am.

Q And under the influence of what?

A Oxytocin.

Q Okay. Because you heard the testimony

of Sarah Harmon that she said she was not aware that you

were under the influence. She said that she was aware you

had a drug problem but not that you were under the

influence. Could you elaborate on that.

A Yes, ma'am. I wasn't in such a drug

coma, like she said, that I don't remember doing what I do,

but the drugs made me do — I mean, it didn't make me do it,

but the drugs was telling me that I needed to get drugs and

59

my addiction was telling me I needed to do whatever I needed to do to get them. And that's what happened. What I did was for to get drugs to feed my addiction.

(See Omnibus Habeas Corpus Transcript at p. 38, L:4-23)

(11) The Court **FINDS** that there was absolutely no good faith basis to assert that the Petitioner was not competent at the time of the alleged offense.

(12) The Court **FINDS** that the Petitioner's trial counsel understood that the Petitioner committed these crimes to support his drug habit, but did not believe this would constitute a viable defense to the charges lodged against her client.

(13) The Court **FINDS** that the Petitioner repeatedly acknowledged his guilt in both his plea colloquy, plea papers, and in correspondence with the Court.

(14) The Court **FINDS** and concludes that the Petitioner's claim that he was not mentally competent at the time of the offense is without merit.

## 3. WAS THE PETITIONER'S SENTENCE DISPORPORTIONATE OR ILLEGAL BY VIRTUE OF IT BEING CONSECUTIVE AND/OR EXCESSIVE AND/OR MORE SEVERE THAN EXPECTED.

### a. The Petitioner's Argument:

A SENTENCE OF FIVE TO FIFTY YEARS WAS EXCESSIVE AND DISPROPORTIONATE TO THE CHARACTER AND DEGREE OF THE OFFENSE PURSUANT TO THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE III SECTION 5 OF THE WEST VIRGINIA STATE CONSTITUTION

The Eighth Amendment of the United States Constitution and Article Three Section Five of the West Virginia Constitution mandate that "[p]enalties should be proportionate to the character and degree of the offense". U.S.C.A. Amend VIII; W. Va. Const. Art III § 5. Indeed, the West Virginia common law dictates that while a trial judge's broad discretion in imposing a sentence "must be tempered by W. Va. Const. III §5, supra, requiring sentences to be proportional to the character and degree of the offense". *State v. Richardson*, 214 W. Va. 410, 589 S.E.2d 552 (2003); *State v. Cooper*, 172 W. Va. 266, 271, 304 S.E.2d 851, 855 (1983) (referring to Syl. Pt. 8, *State v. Vance*, 164 W. Va. 216, 262 S.E.2d 423 (1980)). *See* also, Syl. Pt. 8, *State v. Davis*, 189 W. Va. 59, 427 S.E.2d 754 (1993).

In *State v. Richardson*, the appellant pled guilty to kidnapping and wanton endangerment, which were the offenses that arose out of a domestic dispute. 214 W. Va. 410, 589 S.E.2d 552, 554. The appellant had confronted his pregnant girlfriend accusing her of cheating on him, striking her several times, and forcing her to walk down the street to his grandfather's building. *Id.* He then proceeded to threaten her repeatedly, until he finally calmed down, and they both went back to their apartment peacefully. The next day, he girlfriend's mother noticed several bruises on the girlfriend's face, and advised her to seek medical help. Following the girlfriend's visit to the hospital, the appellant was charged with kidnapping, wanton endangerment, malicious wounding, and domestic battery. The appellant pled guilty to kidnapping and wanton endangerment. The victim testified at his sentencing asking that the trial court impose a minimal sentence upon the appellant. Dr. David Clayman testified that the appellant was not a predator nor an excessively violent

61

person, and that his actions were caused by consumption of alcohol. *Id.* at 554-555.

Nevertheless, the appellant was given a thirty-year sentence for the kidnapping offense, and a five-year sentence for wanton endangerment. *Id.*

On appeal, the West Virginia Supreme Court agreed with the appellant that the thirty-year sentence was disproportionate to the character and degree of the offense. In arriving at its decision, the Court cited Syllabus point 5 of *State v. Cooper*, wherein it set the standard for evaluating "whether a sentence 'offends the conscience and offends the fundamental notions of human dignity'":

> Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends the fundamental notions of human dignity, thereby violating West Virginia Constitution, Article III, Section 5 that prohibit's (sic) a penalty that is not proportionate to the character and degree of the offense.

*Id.* at 555 (quoting Syl. pt. 5 of *State v. Cooper*, 172 W. Va. 226, 304 S.E.2d 85 (1983)). The Court further noted that it must look at "factors affecting the subjective impact of a sentence", such as defendant's age, victim's statement, evaluations and recommendations made prior to sentencing. *Id.* Hence, the West Virginia Supreme Court decided that thirty years in prison for a kidnapping charge in the *Richardson* case was certainly excessive and disproportionate to the character of the offense, in light of the appellant's age, the victim's statement, and the doctor's opinion that the appellant demonstrated a low risk of repeating his behavior. Accordingly, the West Virginia Supreme Court reversed the thirty year sentence, and remanded it to the trial court with instructions that the appellant be sentenced to ten years on the kidnapping charge to run concurrently with the sentence for wanton endangerment. *Id.* at 556.

62

In *State v. Buck*, the West Virginia Supreme Court held that a sentence of seventy-five (75) years imposed upon a defendant, who was convicted of aggravated robbery, was excessive. 173 W. Va. 243, 314 S.E.2d 406 (1984). In that case, the defendant, along with another individual, came into a store in Job, West Virginia, and asked the store owner for soft drinks. *Id.* at 224, 408. As the store owner proceeded to get them soft drinks, the defendant, who was the instigator of this robbery, struck him on the head and robbed him of $1,210.12. *Id.* at 244, 247, 408, 411. The co-defendant pled guilty to grand larceny and was sentenced to one year in jail. Following a trial and a conviction of aggravated robbery, the defendant was sentenced to seventy-five years in the penitentiary. On appeal, the West Virginia Supreme Court viewed this sentence as excessive, despite the fact that the defendant was the instigator of the robbery and that he struck the victim. *Id.* In arriving at its decision, the West Virginia Supreme Court reasoned that the defendant would have received a lesser sentence if he had actually killed the victim. *Id.* at 245, 408-409. The Court compared the seventy-five year sentence to life imprisonment, and noted that under a life sentence, the defendant would be eligible for parole in ten years unless the jury had declined to recommend mercy. However, under the seventy-five year sentence, the defendant would not be eligible for parole for twenty-five years. *Id.* Hence, finding this sentence disproportionate to the character and degree of the offense charged, the West Virginia Supreme Court remanded the case back to the trial court for recommencing (sic).[9]

---

[9] In *Buck*, the defendant actually appealed his case on two occasions, arguing excessive and disproportionate sentence. On the first remand, the circuit court essentially ignored the West Virginia Supreme Court's ruling and reaffirmed its original sentence of seventy-five years. *Id.* at 244, 408. On second remand, the West Virginia Supreme Court designated a different circuit judge to handle the sentencing proceeding. *Id.* at 24, 411.

Similarly, in *State v Cooper*, the West Virginia Supreme Court found the defendant's sentence to be disproportionate to the character and degree of the offense committed, and remanded the case back to the trial court for re-sentencing. 172 W. Va. 266, 304 S.E.2d 851 (1983). In that case, the defendant, William Cooper, was convicted of robbery and sentenced to forty-five (45) years in a penitentiary. *Id.* On appeal, the defendant challenged the proportionality of his sentence under the West Virginia Constitution, Article III, Section 5. *Id.* at 268, 852. The victim in that case had been knocked unconscious and robbed of his wallet, which contained a small amount of cash and several credit cards. Despite the violent nature of the crime, the West Virginia Supreme Court concluded that the forty-five year sentence was "offensive to the system of justice in which proportionality is constitutionally required" and remanded the case back for re-sentencing. *Id.* at 272, 274, 856, 859.

*Richardson, Cooper,* and *Buck* all have a common denominator: they involve violent crimes. Indeed, the offenses in those cases have certainly harmed victims physically, mentally, and emotionally. However, while Fraudulent Scheme, Uttering, and Forgery offenses are certainly serious criminal acts, they are not acts of violence. In the case at bar, the Petitioner was sentenced to five consecutive sentences of one (1) to ten (10) years of incarceration. Effectively, he was given a five (5) to fifty (50) year sentence. The Petitioner was sentenced on March 15, 2010, and was given credit for 211 days, and thus he has served three years in a penitentiary. It will take another two and a half years before the Petitioner becomes eligible for parole, and twenty-three (23) more years before he finishes serving his sentence. The Petitioner pled guilty to five non-violent offenses: to-wit: two counts of Uttering, two counts of

64

Forgery, and one count of Fraudulent Schemes. Five consecutive sentences imposed upon the Petitioner for non-violent offense, without a chance at probation or home confinement, are certainly disproportionate to the character and degree of the offenses, and repugnant to the principles of the Eight Amendment of the United State Constitution and Article III Section 5 of the West Virginia State Constitution.

**b. The State's Answer:**

**PETITIONER'S SENTENCE WAS NOT EXCESSIVE NOR DISPROPORTIONATE TO THE OFFENSE**

This Court articulated the reason for Petitioner's sentence. "I can't see how I can let someone who's already been in the penitentiary for this kind of stuff go on a crime spree through three counties in West Virginia, one county in Virginia and then come in here and say I love my kids and I don't want to see them grow up through pictures and just slap them on the wrist and say goodbye." Tr. 3-15-2010, p. 10. Petitioner had a lengthy criminal history and had been coddled most of his life. His family and society got sick and tired of his continuing criminal history and stopped enabling him. Petitioner, having been coddled and enabled most of his life apparently still expects it.

**c. The Court makes the following specific findings of fact and conclusions of law regarding the claim that the Petitioner's sentence was disproportionate or illegal by virtue of its being consecutive and/or excessive and/or more severe than expected.**

(1)     The Court finds that sentences which are within the statutory limits are not entitled to statutory review. *State v. Koon*, 190 W. Va. 632, 440 S.E.2d 442 (1993).

65

(2)    The Court finds that, while constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by or where there is a life recidivist statute. *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981). at syl. Pt. 4. The sentence in this action is not of either type.

(3)    The Court finds and concludes that the trial court's sentence was within statutory limits and was not based on impermissible factors. *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (W. Va. 1981) at syl. Pt. 4, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

(4)    The Court finds that the following colloquy took place during the Petitioner's guilty plea on February 3, 2010:

> THE COURT: Let me just have those up here. Thank you. Okay. It looks like Mr. Weikle is going to plea guilty to two forgery, two uttering, one fraudulent scheme, going to give up his right to indictment, and he understands he can go to jail for one to ten years on each one of these forgeries and uttering and one to ten years on the fraudulent scheme. He can also be fined up to five hundred dollars on the forgery and uttering each and up to twenty-five hundred dollars on the fraudulent scheme. And the State's not going to try to get any further charges against him for offenses for Richard Weikle, Linda Weikle, Keith Weikle, or Weikle Brothers Lumber Company. And they want — they agree to recommend that his sentence

66

run concurrent with Monroe County and they're not going to seek recidivism under habitual criminal.

Does he have a previous felony?

MS. HARMON: Yes, Your Honor.

THE COURT: Where at?

MS. HARMON: I believe it's out of Monroe County. It was also for forgery.

THE COURT: How long ago was that?

DEFENDANT WEIKLE: 2003.

THE COURT: And then you're got another one — another problem over there now?

MS. HARMON: Your Honor, the charge out of Monroe County stemmed out of this same incident.

THE COURT: That's what I mean. In 2003 you got in trouble over there and had a conviction out of Monroe County. Right?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: Now you're in trouble in Monroe County and in Mercer County. Right?

DEFENDANT WEIKLE: Yes, sir.

THE COURT: Anywhere else?

MS. HARMON: Greenbrier County, Your Honor.

THE COURT: Greenbrier County. What's going on with that?

67

MS. HARMON: Still the same thing. The charge in Monroe County stemmed from the actual alleged theft of the checkbook. The charges here stem from the actual use of the checkbook and credit card. And I believe Greenbrier County is also the use.

THE COURT: Do what?

MS. HARMON: Greenbrier County is also use.

THE COURT: Okay. And he's going to pay restitution to all the victims, or all crimes initially charged. He understands that if I send him to the penitentiary he can't withdraw from the agreement. If either side would violate this, you can go back to the beginning and have a trial.

Now is that the State's understanding of the plea as to Mr. Weikle?

MR. SITLER: Yes, Your Honor.

THE COURT: And Ms. Harmon, is this your understanding of the plea as to Mr. Weikle?

MS. HARMON: Yes, Your Honor.

THE COURT: And Mr. Weikle, is this your understanding of the plea?

DEFENDANT WEIKLE: Yes, Your Honor.

(*See* Plea Transcript at p. 16, L:12 – p. 19, L:8);

68

Further:

THE COURT: As to you, Mr. Weikle, there's no agreement as to punishment or probation. That's a decision I alone make. Do you understand that?

DEFENDANT WEIKLE: Yes, Your Honor.

(*See* Plea Transcript at p. 24, L:4-8);

Further:

THE COURT: All right. Now do you understand also that in your case, Mr. Weikle, that on each of these forgery and uttering, and on this fraudulent scheme, you can get what's called an indeterminate term in the penitentiary of not less than one nor more than ten years, which means this: If I ordered you to do this, you've got to be in jail at least one year on each one of these. Do you understand that?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: And you can be there up to ten years. Now at the end of one year, you'd be eligible for parole but if they don't give it to you, they can keep you.

Now actually you will pull a ten year sentence in half the time, or five years, with your good time, but if you lose your good time, you'd do ten years.

Now you've got five of these right?

DEFENDANT WEIKLE: Yes, Your Honor.

69

THE COURT: I could give you five to fifty. One to ten, plus one to ten, right on up to fifty. You'd have to do five years. You understand that?

DEFENDANT WEIKLE: Yes.

THE COURT: Before you could get out. You could be there up to fifty years. Do you understand that?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: And you'd discharge or pull your time with good time in twenty-five years. Do you understand that?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: Now this is just the gift that keeps on giving because you've got trouble in Monroe County. Right?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: And trouble in Greenbrier County. Right?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: I could give you these sentences consecutive to what time you may get in Greenbrier, and I don't know what you would get, and in Monroe, and I don't know what you would get. You understand that?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: And then last but not least, if you have a prior felony from 2003 that's completed, they could file a recidivist petition on you, it'd have to be tried this term of court and if

70

they did that, then you know, you could get an additional five years tacked onto the end of the fifty years. Do you understand that?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: Now if I ordered those one to tens to run concurrent then you pull them all at the same time. I just wanted to give you the worst scenario. Do you understand that?

DEFENDANT WEIKLE: Yes, Your Honor.

(*See* Plea Transcript at p. 25, L:16 – p. 28, L:8);

Further:

THE COURT: The only thing left for me to do then would be determine what sentence should be imposed on you.

Do you understand that, too?

DEFENDANT WEIKLE: Yes, Your Honor.

(*See* Plea Transcript at p. 59, L:19 – p. 60, L:1);

Further:

Okay. The first thing I want to give you is this letter, it's dated February 2nd, 2010, two-pages long, it's on Public Defender Corporation stationary. Have you seen this letter before?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: You understand that's your contract, or deal or plea agreement with the State?

71

DEFENDANT WEIKLE: Yes.

THE COURT: And you understand who's got to do what.
Right?

DEFENDANT WEIKLE: Yes, Your Honor.

THE COURT: All right. On the first page there, it looks like up at the top, I see you put the number there. You don't have to worry about that.

On the second page, it looks like

Ms. Harmon put — slide the paper up there. You need to initial that, sir.

DEFENDANT WEIKLE: Okay.

THE COURT: What was that you put in there?

MS. HARMON: I had put an "and", Your Honor. I had thought there was one additional —

THE COURT: Okay. And then you signed it at the bottom, didn't you, on the second page?

DEFENDANT WEIKLE: Yes.

(*See* Plea Transcript at p. 65, L:30 – p. 66, L:22)

(5) The Court finds that the aforementioned plea documents, *infra* contained the following questions and answers concerning the assertion that the Petitioner received a disproportionate sentence:

Plea – State vs. Justin K. Weikle

72

Information No:

Having read and understood my foregoing rights and further understanding that any plea bargaining that might appear in the record of this case is not binding upon the Court with respect to punishment or probation, and understanding that in the event I should plead guilty to the **Felony** of **Forgery x2, Uttering x2, and Fraudulent Scheme.**

I could be sentenced to the **penitentiary for the indeterminate term of not less than 1 nor more than 10 years for each count**

It is still my intention and desire to enter a plea of guilty.

THEREFORE, in the presence of **Sarah W. Harmon,** my counsel, who has to my total satisfaction, represented and advised me in this case, and who has fully explained the nature and meaning of the charges contained in the indictment against me; and having received a copy of the indictment before being called upon to plead, I hereby enter a plea of guilty to the **Felony** offense **of two (2) counts of Forgery in violation of WV Code §61-4-5, two 92) counts of Uttering in violation of WV Code §61-4-5, and One (1) Count of Fraudulent Scheme in violation of WV Code Section61-3-24(d),** a provable offense as contained in said indictment.

<u>**Justin Casey Weikle**</u>
Defendant

# THE PETITION TO ENTER PLEA OF GUILTY

## <u>Questions and Answers</u>

(11)  The only plea bargain that I have made with the

Prosecuting Attorney, including any agreement to dismiss

charges, to reduce charges, or to make recommendations as

to sentence, is as follows:

**In exchange for Defendant's Plea of Guilty to the**

**Information, the State agrees not to pursue any**

73

**further charges arising out of the theft and use of checkbooks and/or credit cards of Richard Weikle, Linda Weikle, Keith Weikle, or Weikle Brothers Lumber Company. The State further agrees to recommend concurrency with any sentence received in Monroe County, WV.**

(12) Other than any plea bargain set forth in Paragraph 11, I declare that no person has made any promise or suggestion of any kind to me, or within my knowledge to anyone else that I would receive a lighter sentence, or probation, or any other form of leniency, if I would plead guilty.

(13) I declare that no person has used any threats, forced, pressure or intimidation, to get me to plead guilty, or told me I would receive a heavier sentence, or be denied consideration for probation, if I pleaded "not guilty" and subsequently was found guilty.

## DEFENDANT'S STATEMENT IN SUPPORT OF GUILTY PLEA

(11) What crime or crimes are charged in the information in this case?

**Forgery And Uttering and Fraudulent Scheme**

74

(12) Do you know the penalty for the crime charged, if you plead guilty, or are found guilty? **Yes**

(13) What is the penalty? **1-10 max for each**

(37) Do you know and understand that this Court will not be bound by an agreement or recommendation by the Prosecuting Attorney that pertains to the sentence you will receive if you plead guilty in this case; and do you know that the matter of sentencing is strictly for the Court to decide; and that the Court will not be obligated, or required to give any effect whatsoever to such recommendations?

**Yes**

(38) Has anyone made promises or representations to you as to how the Judge of this Court will dispose of your case with regard to sentence? **No**

(39) Do you understand that the Judge alone, as guided by law, will make the decision as to what sentence will be given with regard to your plea? **Yes**

(40) Except as shown by your plea bargain, if any filed in this case, has anyone promised you leniency, a lighter sentence, probation, or promised not to prosecute you for some other offense or offenses, or offered or paid you money, or offered or gave you property, or by any means

75

whatsoever, induced you, led you, persuaded you, or otherwise caused you to plead guilty? **No**

(41) Except as shown by your plea bargain, if any, filed in this case, has anyone threatened you with a denial of probation, or with a more severe sentence, or with prosecution for some other offense or offenses, or with harm or injury to your person or property, if you were to plead "not guilty," or in any matter, by any means, coerced you, scared you, forced you, or otherwise caused you to plead guilty? **No**

(62) Do you know and understand that by pleading guilty, you waive all of these provisions of the law and Constitutional Rights available to you and that you will be convicted of this crime, and you will be subject to the maximum sentence provided by law, upon your "Plea of Guilty" along, without further proceedings? **Yes**

(63) Has your attorney advised you about the possible application of Chapter 61, Article 11, Section 18 of the Code of West Virginia, the so-called "Habitual Criminal Act," to either this conviction, or any later conviction that you may face at any time in your

76

life?                                                    **Yes**

(6) The Court finds that as to the assertion of a disproportionate sentence Sarah

Harmon, Esq. testified at the Omnibus Habeas Corpus proceeding as follows:

Q Now did you explain to him what his possible sentence could be?

A Yes.

Q What did you tell him?

A Five to fifty.

Q Okay. Did you tell him what his most likely sentence would be?

A I believe I told him about lots of different options. I told him what the

judge could do. I told him the judge could run some of them concurrent.

The judge could run all of them concurrent. The judge could agree to the

concurrency with the other counties, or the judge could not agree with the

concurrency. I went over with him what the different sentencing options the

judge would have.

Q Okay. But did you give him an option of what most likely would happen?

A I — I — I have to be honest. It's been several years ago. I don't remember

the exact discussion.

I have a standard thing that I normally say which is, you know, I can't

promise you anything, I make no guarantees. This is your maximum

sentence. I think you'd be a good candidate for this. I think the judge will

look at this. I don't remember giving him an exact figure, as has been

alleged in the petition.

Q So you're saying that you didn't tell

77

him that his possible sentence, most possible would be 3 to 30?

A I probably told him that was a possibility. It was a possibility. I know I did not promise him anything other than it was be a 5 to 50. I probably told him it end up being a — I could be a 1 to 10. I mean, I told him what it could have been, and one of the thing it could have been was a 3 to 30. I don't ever remember saying that I think — and I don't think I would have said 3 to 30 is what's going to happen or is most likely what's going to happen. Because I don't know that that would have been any more likely than a 2 to 20.

(See Omnibus Habeas Corpus Transcript at p. 18, L:18 – p. 20, L:11);

Further:

Q And do you remember that — whether the judge said he would reconsider the sentences?

A I believe even the Order said the judge — that it could be brought back for reconsideration when the other jurisdictions were resolved.

Q Okay. Did you — so the Order actually said that.

A I believe that that's in the Order, the judge said it can be brought back for reconsideration. I mean, it always can, but I believe the Order says something along the lines that once the other counties are resolved that it can be.

(See Omnibus Habeas Corpus Transcript at p. 21, L:6-17);

Further:

Q Okay. You can go ahead and look.

78

A I'm assuming it had not been. I don't see — I don't see where it's mentioned. So I'm assuming that was still pending when this was filed.

Q Now in your motion you're asking the judge to hold the matter in abeyance until the Defendant's Greenbrier County charges are resolved and grant counsel for the Defendant leave to file a supplemental Motion at that time so that the Court can make a fully informed decision. I'm just reading from the very end of your motion here in the last paragraph. You didn't ask for the Giles County to be resolved in your motion, did you?

A No.

Q And the Order said that the Court would reconsider once all the charges — or may reconsider once the charges in surrounding counties have been resolved, which means all the charges.

A It doesn't say all the charges, but it does say surrounding counties. Yeah.

Q All right. And what was the outcome of the Motion to Reconsider?

A It was denied.

(See Omnibus Habeas Corpus Transcript at p. 23, L:14 – p. 24, L:13);

Further:

Q Did you have any correspondence with the Defendant regarding negotiations and his understanding of perhaps what he may be facing in Mercer County?

A I did. I actually have a letter where at one point he decided that he wasn't sure he wanted to take the plea, he was thinking about backing out of it. And

79

the reason was, that he thought 5 to 50 was a lot and he realized he would have to serve 7 or 8 years if he got the 5 to 50.

MS. WILLIAMSON: Your Honor, may I mark that and make it a part of this.

THE COURT: Sure.

While she's doing that, what did you say the Greenbrier bond was?

THE WITNESS: I don't recall what the Greenbrier was. The Monroe was $20,000 cash only.

MS. HAGER: Your Honor, I don't believe I've seen a copy of that letter.

THE WITNESS: I have extra copies attached. I have the original and extra copies.

MS. HAGER: Okay.

RESPONDENT'S EXHIBIT NUMBER 1 MARKED FOR IDENTIFICATION

The document referred to was thereupon marked for identification as above indicated.

MS. WILLIAMSON: Respondent would move for introduction of Exhibit Number 1.

THE COURT: Any objection?

MS. HAGER: No, sir.

THE COURT: All right. It'll be introduced without objection.

RESPONDENT'S EXHIBIT NUMBER 1 ADMITTED INTO EVIDENCE

The document previously marked for identification as above indicated was thereupon admitted into evidence.

80

BY MS. WILLIAMSON:

Q So Mr. Weikle knew exactly what he was facing as far as the sentence in this Court.

A I believe he did.

(See Omnibus Habeas Corpus Transcript at p. 25, L:16 – p. 27, L:8);

Further:

THE COURT: All right. Let me ask you a couple of things here. I just got this file out and was looking at it. On the Motion that you filed to reconsider that you filed on July 10, 2010, —

THE WITNESS: Yes, sir.

THE COURT: — Paragraph — see I don't remember anything about it. Did he have a previous felony history?

THE WITNESS: Yes. And part of the plea, the State was not going to seek recidivist penalty.

THE COURT: What kind of previous felony history did he have?

THE WITNESS: I believe it was previous forgery — forgery and uttering charges.

THE COURT: So he went to the penitentiary somewhere for that. Where?

THE WITNESS: I believe it was in West Virginia.

THE COURT: All right. He's got at least one previous felony that he's spent time in the penitentiary for.

How many charges are pending in Greenbrier County?

81

THE WITNESS: I believe Greenbrier County may have just been a misdemeanor.

THE COURT: Okay. Misdemeanors in Greenbrier. What did he have in Monroe?

THE WITNESS: That I recall, it was the B and E — the theft, the B and E where he broke into the building where he stole the checkbook, the theft of the checkbook and maybe some use. I don't remember if there was use in Monroe County or not.

And the Greenbrier County was use, I believe, of the credit card that he was alleged to have stolen in Monroe County. I'm not positive on that, though.

THE COURT: And it says here he got 2 to 20 in Greenbrier —

THE WITNESS: In Monroe.

THE COURT: I'm sorry. In Monroe and that was going to run concurrent with what I gave him.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. So they — whatever happened in Greenbrier, once I sentenced him, they dismissed it.

THE WITNESS: Right.

THE COURT: Whatever happened in Monroe, once they let him plea, they ran it concurrent, they still want him in Virginia, and you didn't try to get him out on bond because even if I had put him out on bond, all that would have done is send him to Monroe County where he had a 20,000 cash only

82

bond, which would have been irrelevant because he had a hold at the Regional Jail from another state.

THE WITNESS: Yes, Your Honor.

(See Omnibus Habeas Corpus Transcript at p. 29, L:15 – p. 31, L:23)

(7) The Court finds that at the Omnibus Habeas Corpus proceeding Justin Kasey Weikle testified on the issue of disproportionate sentencing as follows:

Q Okay. And at the time of this case in Mercer County, did you also have charges pending in other counties?

A Yes, ma'am.

Q What counties?

A Monroe County, Greenbrier County and Giles County, Virginia.

Q Okay. When were — do you remember when the charges were resolved in Monroe County?

A Monroe, I believe, was in April, 2010.

Q Okay. And when was your sentencing in Mercer County? Do you remember?

A March.

Q Of what year?

A 2010.

Q Okay. So Monroe was just resolved just a month after – -

A Yes.

Q – - your sentencing.

And what about Greenbrier?

83

A A few months later, the charges were thrown out because of failure to —

Q Would it fair to say those charges were dropped on August the 30th, 2010?

A Yes.

Q And what about Giles?

A Giles County, I filed a motion to be sent to Giles County, and that was 2011.

Q Okay.

A And they were resolved.

Q And what happened there?

A I was given ten years on each of the four counts and they were run concurrent, and he suspended nine years and five months of it and I serve seven month which turns out to be a six month sentence. And probation after that.

Q So after you're done with Mercer County, you have six months in Virginia in Giles County?

A Yes, ma'am.

(See Omnibus Habeas Corpus Transcript at p. 36, L:11 – p. 38, L:3);

Further:

Q Okay. And what was your — do you remember what you were sentenced to in Mercer County?

A Five to fifty years.

Q Okay. What was your belief that you would be sentenced to?

84

A I believed that I could possibly get five to fifty years but I was believing that some of these charges would be run concurrent, that I'd end up with a three to thirty year sentence.

Q That's what you believed you would end up with?

A Yes.

Q And what made you believe that?

A When I met with Ms. Harmon at the preliminary hearing we talked about this and she came at me with a plea that the State offer was five to fifty. And I'm like, "That's really — that's the best that you think you can get for me?"

And she's like, "Yeah."

I was like, "Do you really think they'll give me all this time?"

And she's like, "More than likely something a little less."

And I'm like, "So what, a two to twenty?"

And she's like, "More than likely a three to thirty" is her exact words I remember her saying.

And I was like, "Well, okay. That sounds good, you know."

But she was very clear, you know, I could get all five charges.

Q But she said more than likely three to thirty?

A Yeah.

Q So what did you believe?

A I believe I was getting a three to

85

thirty, that I could possibly come out of the situation with a three to thirty year sentence.

Q Okay. If you knew for sure that you were getting five to fifty, what would you have done? Would you have taken the plea?

A No, ma'am.

Q What would you have done?

A I would have tried to have waited it out as long as I could, hopefully come out with a better plea bargain.

Q Okay. You would have waited to be indicted?

A Yes, ma'am.

Q And when did you actually first realize you were getting a five to fifty?

A Actually the day I was sentenced in the courtroom I was I guess hopefully wishing and thinking and hope like I'm going to get the three to thirty, maybe he'll suspend this with probation, that I completed parole, did eighteen months on parole, and I'd be a good candidate for probation. And when the judge sentenced me to a consecutive term, it was like — I don't know, I just kind of blanked out because I knew I was going to prison for the three to thirty — at three to thirty years because that's what I had in my mind I was going to be doing. And it wasn't until a couple of weeks later when I received the sentencing order that it said my parole date August, 2014. And I was like, wow. I really thought I was going to get the three to thirty. I thought I was - - I just had

86

that stuck in my mind from the beginning, waiting to get sentenced and thinking — hoping that. And that's when I realized.

(See Omnibus Habeas Corpus Transcript at p. 39, L:1 – p. 42, L:2)

(8) The Court **FINDS** that the Petitioner fully understood and acknowledged that he could receive the sentence given to him.

(9) The Court **FINDS** that the Petitioner was fully advised of this sentence by the Court and his counsel.

(10) The Court **FINDS** that the Petitioner was previously convicted of felonies for which he was sentenced to the penitentiary.

(11) The Court **FINDS** that in this action, the State gave up its right to seek enhanced penalties, based on the Petitioner's prior conviction.

(12) The Court **FINDS** that, as mentioned above, in III.C.1, the Petitioner received substantial concessions in sentencing from the other jurisdictions.

(13) The Court **FINDS** that the Petitioner was sentenced within statutory limits.

(14) The Court **FINDS** and concludes that the Petitioner's claim that he received a disproportionate sentence is without merit.

## IV. RULING

Wherefore, for the reasons set forth in the foregoing opinion order, the Court orders and adjudges as follows:

1. That the Petition for Writ of Habeas Corpus brought by the Petitioner is hereby **DENIED** and this action is **ORDERED** removed from the docket of this Court.

2. The Court appoints Natalie Hager, Esq. to represent the Petitioner on any appeal of this ruling.

3. This is the final order. The Circuit Clerk is directed to distribute a certified copy of this Order to Natalie Hager, Esq.; to Scott A. Ash, Esq., Prosecuting Attorney of Mercer County, West Virginia; and to the Petitioner, Justin Kasey Weikle, at Huttonsville Correctional Center, P.O. Box 1, Huttonsville, West Virginia, 26273.

Entered this the 18th day of November, 2013.

_____
DEREK C. SWOPE, JUDGE

THE FOREGOING IS A TRUE COPY OF A DOCUMENT
ENTERED IN THIS OFFICE ON THE 18th DAY
OF November 20 13
DATED THIS 19th DAY OF November
20 13

JULIE BALL, CLERK OF THE
CIRCUIT COURT OF MERCER COUNTY WV

BY _____
HER DEPUTY

88